IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MISTY THACKER, §
§
        Plaintiff, §
§
v. § CIVIL ACTION NO. H-18-566
§
ANDREW SAUL,[1] §
COMMISSIONER OF THE §
SOCIAL SECURITY ADMINISTRATION, §
§
        Defendant. §

## <u>**MEMORANDUM OPINION**</u>

Pending before the court[2] are Defendant's Cross-Motion for Summary Judgment (Doc. 18) and Plaintiff's Motion for Summary Judgment (Doc. 22). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **GRANTS** Defendant's motion and **DENIES** Plaintiff's motion.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for

---

[1]     Nancy Berryhill was the Acting Commissioner of the Social Security Administration ("SSA") at the time that Plaintiff filed this case but no longer holds that position. Andrew Saul is now Commissioner of the SSA and, as such, is automatically substituted as the defendant in this case. <u>See</u> 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2]     The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Doc. 12, Ord. Dated Feb. 5, 2019.

disability insurance benefits under Title II and for supplemental security income under Title XVI of the Social Security Act ("the Act").

Plaintiff was born on April 20, 1979, and was thirty-five years old on the alleged disability onset date of June 1, 2014.[3] Plaintiff's job history did not qualify as past relevant work.[4]

## A. **Medical Evidence and Administrative Proceedings**

Plaintiff was treated, on and off, for psychiatric impairments for years prior to June 1, 2014.[5] However, in November 15, 2013, a little more than six months before her alleged onset date, Plaintiff was discharged from treatment for noncompliance after missing an appointment and not responding to an inquiry.[6] Plaintiff moved to Michigan where she received little psychiatric care, with no more than three appointments from November 2013 through October 2014.[7] At an appointment with a psychiatrist, prior to the alleged onset date, Kaushik Raval, M.D., ("Dr. Raval") noted that Plaintiff was "able to work two steady part-time jobs."[8] Only one appointment in Michigan fell during the alleged disability

---

[3] See Tr. of the Admin. Proceedings ("Tr.") 132-34, 145, 156-57, 166-67, 176-77, 266, 304.

[4] See Tr. 54, 282.

[5] See, e.g., Tr. 443.

[6] See Tr. 655.

[7] See Tr. 412-32.

[8] Tr. 432.

period.[9]   At that appointment with a therapist, Plaintiff's appearance was disheveled and bizarre, and she presented with agitated motor activity, flat affect, depressed mood, and disorganized thinking.[10]   She also reported visual and auditory hallucinations.[11]   Yet, she was fully oriented with lucid/coherent thought content.[12]   Plaintiff reported that she was two months into daily intravenous heroin use.[13]   The therapist recommended a psychiatric evaluation, medication management, and treatment for substance dependence.[14]

Plaintiff returned to Texas and, on September 3, 2014, applied for disability insurance benefits and supplemental security income claiming an inability to work since June 1, 2014, due to bipolar disorder and schizophrenia.[15]

Approximately six weeks after her return to Texas, she resumed treatment.[16]   On October 17, 2014, Plaintiff attended a psychiatric

---

[9]   See Tr. 420.  The date of the record is obscured by a confidentiality stamp but appears to be July 25, 2014.  See id.  The only other treatment notes from that practice are from a therapist appointment and a psychiatric evaluation, both in early December 2013.  See Tr. 414, 432.

[10]   See Tr. 420.

[11]   See id.

[12]   See id.

[13]   See id.

[14]   See id.

[15]   See Tr. 132-34, 145, 156, 166, 176-77, 266-67, 291.  Plaintiff applied twice previously in 2009 and 2010 and was denied.  See Tr. 135, 146, 157, 167.

[16]   See Tr. 443-48, 454.

assessment with Mark Williamson, M.D., ("Dr. Williamson").[17]  At that time, she expressed "a desire to resume medications."[18] Plaintiff reported experiencing paranoia, auditory hallucinations, and hopelessness but denied suicidal or homicidal ideation or the "ongoing use of alcohol, cannabis, illicit drugs, or inappropriate use of prescription medications or over the counter products."[19] She stated that her most recent suicide attempt was three years prior and her most recent violent behavior was slapping someone six months prior to the appointment.[20]  Plaintiff self-reported information that was inconsistent with her prior appointments, including that she had not used intravenous drugs in the prior eight years.[21]  The mental status examination produced normal results with limited insight and judgment.[22]

Dr. Williamson diagnosed Plaintiff with bipolar disorder, post traumatic stress disorder ("PTSD"), and polysubstance dependence and opined that Plaintiff's prognosis for recovery was guarded but would "be more positive" if she complied with the treatment plan.[23] Dr. Williamson and Plaintiff settled on psychopharmacologic therapy

---

[17]    See Tr. 443-48.

[18]    Tr. 443.

[19]    See id.

[20]    See id.

[21]    Compare Tr. 420 with Tr. 444.

[22]    See Tr. 445-46.

[23]    Tr. 446.

augmented by rehabilitation training, therapy when appropriate, and chemical dependency counseling.[24]  Plaintiff returned a week later for medication management.[25]  A urinalysis from that date was positive for cannabinoids and benzodiazepines.[26]

Sometime after this appointment, Dr. Williamson completed an undated Physician's Certificate of Medical Examination in support of Plaintiff's guardianship application.[27]  From a list of ten cognitive functional areas, the only one in which Plaintiff had a deficit, according to Dr. Williamson, was "[b]reaking down complex tasks . . . into simple steps and carrying them out[.]"[28]  He found no deficit in any of the following areas: short-term memory; long-term memory; immediate recall; understanding and communicating; recognizing familiar objects and persons; performing simple calculations; reasoning logically; grasping abstract aspects of her situation; or interpreting idiomatic expressions and proverbs.[29]

Regarding decision making, Dr. Williamson opined that Plaintiff could not: (1) "[m]ake complex business, managerial, and financial decisions[;]" (2) "[m]anage a personal bank account[;]" (3) "[d]etermine [her] own residence[;]" or (4) "[a]ttend to

---

[24]  See Tr. 447.

[25]  See Tr. 454.

[26]  See id.

[27]  See Tr. 698-701.

[28]  Tr. 699.

[29]  See id.

instrumental activities of daily living [("ADLs")](e.g., shopping, cooking, traveling, cleaning)[.]"[30] On the other hand, he found her capable of voting, making decisions regarding marriage, administering her own medications, attending to basic ADLs, and consenting to treatment.[31] Dr. Williamson opined that Plaintiff was totally incapacitated due to severe mental illness and polysubstance dependence.[32]

On October 28, 2014, Plaintiff attended a consultative clinical psychological interview with Daniela Costa, Ph.D., ("Dr. Costa").[33] Plaintiff and her stepmother provided information about Plaintiff's psychiatric condition.[34] Plaintiff reported experiencing visual and auditory hallucinations and paranoia, pacing and smoking due to anxiety, staying home to avoid auditory hallucinations and panic attacks, "seeing her face as distorted[,]" and having low self-esteem.[35] Plaintiff and her stepmother described Plaintiff's ADLs:

> [Plaintiff] tends to watch TV and read. She needs
> assistance with activities of daily living. She lays
> [sic] down at 12 and wakes up at 3 p.m. She does not
> prepare meals. She needs reminders to bathe. Her mother
> [sic] handles her finances. Her family assists with

---

[30]    Tr. 699.

[31]    See id.

[32]    Tr. 701.

[33]    See Tr. 434-48.

[34]    See Tr. 434.

[35]    Id.

transportation and shopping.[36]

Dr. Costa found no discrepancies in Plaintiff's self-report.[37] Dr. Costa noted that Plaintiff's records indicated a history of bipolar disorder and opioid dependence.

Dr. Costa performed a mental status examination and recorded essentially normal results except that Plaintiff sat in nine "different postures with her hands held against her face [and] rocked side to side[,]" presented with anxious mood and restricted affect, and exhibited difficulty with recall and concentration.[38] Dr. Costa listed Plaintiff's diagnoses as bipolar disorder, severe with psychosis; panic disorder; and tobacco and cannabis use disorders.[39] Regarding Plaintiff's functional capability, Dr. Costa opined:

> [Plaintiff] showed deficits in remote, recent, and immediate memory. She also showed problems with concentration. She may have difficulty with complex and simple directions. She may also have difficulty communicating and working with others due to paranoia. She reported becoming physically aggressive with a co-worker.[40]

On December 5, 2014, Plaintiff attended a medication management appointment at which she reported medication compliance

---

[36]    Tr. 435.

[37]    See Tr. 436.

[38]    Id.

[39]    See Tr. 437.

[40]    Id.

and decreased symptoms.[41]

On December 11, 2014, the SSA found Plaintiff not disabled at the initial level of review.[42] Richard Campa, Ph.D., ("Dr. Campa") reviewed Plaintiff's record, including Dr. Costa's report, and determined that Plaintiff could "understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in routine work setting."[43] Dr. Campa noted that the medical record suggested that Plaintiff was stable when in compliance with medication therapy and that she was discharged from treatment in November 2013 for missing appointments.[44]

At a therapy session on February 6, 2015, Plaintiff's therapist noted Plaintiff's progress toward her treatment goals by abstaining from the use of illegal drugs, maintaining stable housing with her parents and sister, and developing more awareness of her diagnosis.[45] Plaintiff denied suicidal or homicidal ideation.[46] The therapist noted increased PTSD symptomatology and

---

[41] See Tr. 484-90.

[42] See Tr. 43, 132-33 143, 154,180-87.

[43] Tr. 142, 153; see also Tr. 137-41, 148-52.

[44] See Tr. 137.

[45] Tr. 480.

[46] See id.

Plaintiff's desire to engage in therapy to address those issues.[47] Plaintiff attended therapy sessions in February and March 2015.[48]

On February 11, 2015, Plaintiff attended a medication management appointment.[49] A mental status examination was within the normal range with anxious mood, average intellectual functioning, and fair insight and judgment.[50] On March 7, 2015, Plaintiff was admitted to the Comprehensive Psychiatric Emergency Program.[51] Upon discharge four days later, Plaintiff was diagnosed with bipolar disorder with psychotic features.[52]

On March 11, 2015, in connection with the reconsideration of Plaintiff's disability claim, the Houston Cooperative Disability Investigations Unit received a referral[53] "for investigation of fraud/similar fault due to possible malingering and exaggeration of symptoms."[54] On April 28, 2015, the disability fraud specialist issued a report ("investigative report"). Therein, the disability fraud specialist provided an account of her interview with Plaintiff, which included the following information:

---

[47]    See id.

[48]    See Tr. 505-11.

[49]    See Tr. 491-96.

[50]    See Tr. 493-94.

[51]    See Tr. 725.

[52]    See id.

[53]    The report indicated that "DDS" made the referral.  See Tr. 516.

[54]    Id.; see also Tr. 514.

> During the interview with [Plaintiff,] I found her to be
> dressed in a t-shirt and sweat pants. . . . She was in a
> good mood.    She was alert and attentive to the
> investigation.  She was able to follow the investigation
> and maintain good conversation.  She stated that she
> normally shops at Walmart and HEB.  She said that she
> pays with cash. . . . [S]he said that she lives with her
> parents and sister. . . . [and] her dad does most of the
> cooking and . . . she helps him . . . . [Plaintiff] was
> able to recite her [date of birth], [Texas driver's
> license number,] and last four [digits] of her [social
> security number].  She stated that she is an 'avid' user
> of the computer . . . . and that she is taking medication
> for bipolar and has been 'doing well' the last seven
> years since she has been taking medications.  I did not
> observe any displays of odd or unusual behavior.[55]

No definitive opinion on the allegations was offered.[56]

A mental status examination performed on March 16, 2015, was within the normal range except for limited insight and judgment.[57] Dr. Williamson described Plaintiff's mood as irritable and dysthymic.[58]

On May 7, 2015, the SSA notified Plaintiff that it had disapproved her claim upon reconsideration.[59]  The Explanation of Determination noted that the investigative report was considered in deciding Plaintiff's claim.[60]  Included as additional information to the explanation was a notice that the report from Dr. Costa's

---

[55]     Tr. 519.

[56]     See Tr. 515-21.

[57]     See Tr. 501-02.

[58]     See Tr. 501.

[59]     See Tr. 43, 165, 175-77, 191-97.

[60]     See Tr. 196.

October 2014 consultative examination was not "used as evidence" because there was "reason to believe that the information provided regarding disabling limitations [was] incorrect and misleading."[61] Michele Chappuis, Ph.D., ("Dr. Chappuis") reviewed Plaintiff's file and found that Plaintiff's subjective symptoms were not supported by the medical record.[62] In Dr. Chappuis's opinion, Plaintiff did not have any impairment or combination of impairments that was severe.[63]

In mid-November 2015, Plaintiff was admitted to the Comprehensive Psychiatric Emergency Program for suicidal ideation.[64] She was discharged with the diagnoses bipolar disorder, PTSD, and polysubstance dependence.[65] At discharge, Plaintiff was tolerating her medications and experiencing no suicidal or homicidal ideation and no audio or visual hallucinations.[66] In a followup therapy appointment, Plaintiff reported progress in life domain functioning, improved sleep, and no suicidal or homicidal ideation.[67]

In January through September 2016, Plaintiff received skills

---

[61] Tr. 195.

[62] See Tr. 160, 162-63, 170, 172-73.

[63] See Tr. 162, 172.

[64] See Tr. 811-12, 991.

[65] See Tr. 716.

[66] See Tr. 717.

[67] See Tr. 817.

training and therapy and attended medication management appointments.[68]  In April and July 2016, Plaintiff's mental status examinations were within normal limits with euthymic mood and fair insight and judgment.[69]  In September 2016, Plaintiff reported that her medications were working well and that she felt normal.[70]

In mid-June 2016, The Texas Department of Assistive and Rehabilitative Services ("DARS") conducted a Supported Employment Assessment of Plaintiff.[71]  In an interview, Plaintiff stated that she was not looking to pursue employment at that time.[72]  Based on Plaintiff's negative response to the presence of several male clients at the workshop, the DARS employment specialist opined that Plaintiff would "have a difficult time working on a job where she would have to interact with people, especially men."[73]

The DARS employment specialist noted that Plaintiff was able to wash dishes, clean, mop, sweep, organize her bedroom, and vacuum independently and was able to do laundry when prompted.[74]  Plaintiff reported that her psychiatric conditions were managed by five

---

[68]   See Tr. 1052-90.

[69]   See Tr. 1068-69, 1080-81.

[70]   See Tr. 1052, 1056.

[71]   See Tr. 823-50.

[72]   See Tr. 825.

[73]   Tr. 827.

[74]   See Tr. 829.

medications.[75]  However, Plaintiff said that she experienced various side effects, including dizziness, tiredness, nausea, nervousness, blurred vision, diarrhea, and urinary frequency, which, the DARS employment specialist opined, had interfered with Plaintiff's work performance in prior jobs.[76]  Plaintiff denied any substance abuse issues.[77]

As part of the assessment, Plaintiff spent six hours performing work skills in a mock retail store.[78]  Plaintiff was able to perform the following job tasks: cleaning, retail zoning, stocking, sorting clothes, and retrieving carts from the parking lot.[79]  She also passed a cognitive functions test.[80]  However, Plaintiff had to be prompted to stay awake on multiple occasions throughout the day.[81]  The DARS employment specialist also noted other functional limitations: (1) difficulty staying focused; (2) inability to work around a crowd of people; (3) discomfort around men; (4) inability to work in a team environment; and (5) difficulty bending and kneeling.[82]

---

[75]     See Tr. 831.

[76]     See Tr. 831, 832.

[77]     See Tr. 831.

[78]     See Tr. 834-37.

[79]     See Tr. 835-36.

[80]     See Tr. 836.

[81]     See Tr. 835-36.

[82]     See Tr. 836.

Plaintiff also toured a large retail store and a movie theater during the assessment.[83] The DARS employment specialist noted that Plaintiff became uncomfortable at the retail store in the presence of others on the tour and store customers but that she was more comfortable on the tour of the movie theater due to the presence of fewer people.[84] The DARS employment specialist recommended that Plaintiff not work in a crowded environment or be required to interact with customers.[85] Because of Plaintiff's discomfort with being around others, the DARS employment specialist opined that Plaintiff would "have a difficult time maintaining employment."[86] In addition to working in an environment that limits contact with others, the DARS employment specialist identified other "non-negotiable employment conditions" that eliminated jobs requiring fast-paced work; extensive standing, walking, lifting, bending, and kneeling; and attention to detail.[87] The DARS employment specialist opined in conclusion that Plaintiff "would not be able to work in the traditional employment model[] but may want to explore working from home."[88]

Plaintiff requested a hearing before an ALJ, and the hearing

---

[83]    See Tr. 837-39.

[84]    See id.

[85]    See Tr. 839.

[86]    Tr. 845.

[87]    See Tr. 846.

[88]    Tr. 848.

was held on October 12, 2016.[89]  At the hearing, Plaintiff, her stepmother, and a vocational expert testified.[90]  An attorney represented Plaintiff at the hearing.[91]

After Plaintiff and her stepmother testified, the ALJ presented the following hypothetical individual to the vocational expert:

> The claimant is a younger individual with a limited education.  I do find she's literate.  I'm going to find that there are no exertional limitations.  She can sit, stand, walk six of eight each for a full eight-hour day.  Her push/pull and gross, fine is unlimited. . . . As to her ability to climb stairs, she can do that.  She can climb stairs, ladders, run.  She can bend, stoop, crouch, crawl, balance, twist, and squat.  Occasional exposure to any dangerous machinery, and that's because of her mental state.  And[,] in addition, she does have the ability to get along with others.  She can understand simple instruction [sic], concentrate and perform simple tasks, and respond and adapt to workplace changes and supervision, but in an occasional public/employee contact setting.[92]

The vocational expert identified three medium, unskilled jobs that such an individual could perform: (1) laundry worker; (2) industrial cleaner; and (3) dishwasher.[93]

In response to the attorney's questions, the vocational expert said that an individual who missed more than three days of work per

---

[89]   See Tr. 69, 198-201, 216.

[90]   See Tr. 70, 73-130.

[91]   See Tr. 69.

[92]   Tr. 126-27.

[93]   Tr. 127.

month, who needed to lie down two to three hours per day for more than thirty minutes, who had "no useful ability to function in. . . relating to coworkers, the general public, supervisors[,]" who had no ability to deal with normal stress and decompensated or became violent, who needed to be prompted every hour to complete a task, or who once or twice a month verbally abused or slapped someone she encountered at work was not employable.[94]

## B. **Commissioner's Decision**

On December 27, 2016, the ALJ issued an unfavorable decision.[95] At the outset, the ALJ addressed Plaintiff's objection to the consideration of the investigative report, claiming that it was based on the exclusion from consideration of the October 2014 consultative report,[96] that the reason for the investigation was not known, and that the report reflected the medical opinions of nonmedical personnel.[97]  The ALJ refused to exclude either the investigative report or the agency's determination that information

---

[94]    See Tr. 128, see also 127, 129-30.

[95]    See Tr. 43-56.

[96]    The court does not share Plaintiff's and the ALJ's certainty that the investigation was based on the additional information addendum to Plaintiff's explanation of claim determination on reconsideration.  On its face, the addendum does not make a referral for investigation.  See Tr. 195.  Furthermore, its location in the record indicates that it was included with the materials sent to Plaintiff when her claim was denied on reconsideration.  See Tr. 191-97.  The court finds it more likely that the "reason to believe that the information provided regarding disabling limitations is incorrect and misleading" is, in fact, the investigative report, which was completed approximately one week before the denial was issued.  Tr. 195.  The investigative report, itself, provided the reason it had been initiated, namely, due to "fraud/similar fault due to possible malingering and exaggeration of symptoms."  Tr. 516.

[97]    See Tr. 43.

provided at the consultative examination was incorrect and misleading.[98]  However, the ALJ afforded the latter little weight because it had "no authenticated author and date and lack[ed] any veracity."[99]  The ALJ continued, "As to the authority of th[e] document to initiate [the] investigation, I leave that discretion and determination to the lower level state agency, whoever they [sic] may be."[100]

Based on Plaintiff's earning records, the ALJ calculated Plaintiff's date last insured to be September 30, 2016.[101]  The ALJ further found that Plaintiff had not engaged in substantial gainful activity since June 1, 2014, the alleged onset date.[102]  The ALJ recognized obesity, bipolar disorder, PTSD, and schizophrenia as severe.[103]  However, he found "right hand impairment, hepatitis C, and drug abuse, in full remission[,]" to be nonsevere impairments.[104]

At the next step, the ALJ found that Plaintiff did not meet the requirements of any impairment identified in the regulations as

---

[98]    See id.

[99]    Id.

[100]   Id.

[101]   See Tr. 44, 46.

[102]   See Tr. 46.

[103]   See id.

[104]   See Tr. 47.

presumptively disabling[105] (the "Listings"), specifically addressing Listings 12.03 (schizophrenia spectrum and other psychotic disorders), 12.04 (depressive, bipolar, and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders).[106]

The ALJ found Plaintiff's residual functional capacity ("RFC") to be:

> a full range of work at all exertional levels. She can sit, stand and walk six of 8 hours each for a full 8-hour day. Her push/pull and gross/fine dexterity is unlimited. She can climb stairs and ladders and can run. She can bend, stoop, crouch, crawl, balance, twist and squat. She requires [sic] occasional exposure to dangerous machinery. She gets along with others, understands simple instructions, concentrates and performs simple tasks, and responds and adapts to workplace changes and supervision, but in an occasional public/employee contact setting.[107]

In support of this assessment, the ALJ addressed subjective testimony provided by Plaintiff and her stepmother as well as the objective medical evidence on Plaintiff's psychiatric condition and obesity.[108] The ALJ found that Plaintiff was "able to perform household chores, clean, watch television, maintain her personal hygiene, shop in stores and by computer, and prepare simple meals[.]"[109]

---

[105]    See 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[106]    See Tr. 47-49.

[107]    Tr. 49.

[108]    See Tr. 50-54.

[109]    Tr. 50.

He considered other factors as well, including evidence: (1) that medication controlled Plaintiff's psychiatric impairments; (2) that she was discharged from treatment in November 2013 for noncompliance; (3) that she did not receive treatment for the subsequent year; (4) that she denied suicidal and homicidal ideation in November 2015 after medication adjustments; (5) that she was able to participate in facility tours during the DARS employment assessment; and (6) that she was able to steadily work part-time jobs.[110] He also commented on the lack of evidence supporting her hearing testimony that she was hospitalized in February 2016.[111]

The ALJ discussed the medical opinions and assigned weight to them and other evidence in the record.[112] The ALJ afforded little weight to Dr. Costa's consultative examination because it was "inconsistent with the medical evidence of record" and because Dr. Costa "appear[ed] to rely on [Plaintiff's] self-reporting of symptoms."[113] The ALJ also found the following opinions entitled to little weight: (1) Dr. Chappuis's opinion that Plaintiff did not have a severe mental impairment because other opinions and the hearing testimony indicated that Plaintiff did have severe mental

---

[110]    See Tr. 50, 52-54.

[111]    See Tr. 52.

[112]    See Tr. 50-54.

[113]    Tr. 51.

impairments; (2) Dr. Williamson's opinion that Plaintiff suffered extreme limitations because it was not consistent with the treating and other records, was not consistent with Plaintiff's self-reported capabilities, and was "so extreme it lack[ed] even the most basic veracity[;]" (3) DARS' assessment that Plaintiff could not "work in the traditional employment model" because it was "grossly inconsistent with the medical evidence of record" and Plaintiff's ADLs; and (4) the hypothetical restrictions that Plaintiff's attorney posed to the vocational expert because "little evidence" supported them.[114]

The ALJ also found Plaintiff's stepmother's testimony not entitled to significant weight because it was "not consistent with the preponderance of the evidence in this case."[115] The ALJ afforded some weight to the investigative report based upon the observations noted therein.[116] He afforded great weight to the following opinions: (1) Dr. Campa's opinion on review of Plaintiff's file at the initial level because it was "consistent with the evidence of record and therefore persuasive[;]" (2) Dr. Raval's opinion that Plaintiff could "work at steady part-time jobs" because it was well-supported by medically acceptable techniques and consistent with record evidence; and (3) the

---

[114]    Tr. 53-54, 56.

[115]    Tr. 54.

[116]    See Tr. 51.

vocational expert's opinion that Plaintiff could adjust to work that existed in significant numbers in the national economy.[117]

Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff was able to perform the occupations of laundry worker, industrial cleaner, and dishwasher.[118] Accordingly, the ALJ found that Plaintiff was not disabled at any time from the alleged onset date to the date last insured.[119]

On January 3, 2017, Plaintiff appealed the ALJ's unfavorable decision.[120] On March 28, 2017, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[121] After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court by filing an application to proceed in forma pauperis on May 24, 2017.[122]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating

---

[117]    Tr. 53, 56.

[118]    See Tr. 55.

[119]    See Tr. 44, 56.

[120]    See Tr. 37.

[121]    See Tr. 1-5.

[122]    See Doc. 1, Appl. to Proceed In Forma Pauperis in Related Misc. Case No. H-17-1337.

the record; and 2) substantial evidence in the record supports the decision. <u>Waters v. Barnhart</u>, 276 F.3d 716, 718 (5th Cir. 2002).

## A. <u>Legal Standard</u>

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act. <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has

done in the past must be found "not disabled;" and (5) if
the claimant is unable to perform h[er] previous work as
a result of h[er] impairment, then factors such as h[er]
age, education, past work experience, and [RFC] must be
considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20
C.F.R. §§ 404.1520, 416.920. The analysis stops at any point in
the process upon a finding that the claimant is disabled or not
disabled. Greenspan, 38 F.3d at 236.

## B.  **Substantial Evidence**

Substantial evidence "means—and means only—such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion." Biestek v. Berryhill, ____ U.S. ____, 139 S. Ct.
1148, 1154 (2019)(internal quotations marks omitted). "[W]hatever
the meaning of 'substantial' in other contexts, the threshold for
such evidentiary sufficiency is not high." Id. It only requires
"more than a mere scintilla." Id.

The Commissioner has the responsibility of deciding any
conflict in the evidence. Id. If the findings of fact contained
in the Commissioner's decision are supported by substantial record
evidence, they are conclusive, and this court must affirm. 42
U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings
exist to support the Commissioner's decision should the court
overturn it. See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir.
1988). In applying this standard, the court is to review the

23

entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. <u>Id.</u>

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits. Plaintiff asserts that the ALJ's decision failed to properly evaluate the medical evidence. Specifically, Plaintiff takes issue with the ALJ's assignments of little weight to Dr. Williamson's Physician's Certificate of Medical Examination, Dr. Costa's report, and the DARS Supported Employment Assessment. She also complains that the ALJ gave too much weight to Dr. Campa's opinion on review of Plaintiff's records.[123] Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

The ALJ must evaluate every medical opinion in the record and decide what weight to give each. <u>See</u> 20 C.F.R. §§ 404.1527(c)(applying to claims filed before March 27, 2017), 416.927(c)(same). Generally, the ALJ will give more weight to medical sources who treated the claimant because "these sources are

---

[123] Plaintiff mentions that the ALJ gave some weight to the investigative report but does not argue that he erred in so doing.

likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Greenspan, 38 F.3d at 237 (quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); SSR 96-5p, 1996 WL 374183, at *2.

The ALJ is required to give good reasons for the weight given a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p, 1996 WL 374188, at *5.

> When the determination or decision . . . is a denial[,] . . . . the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5. The regulations require that, when a treating source's opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record, it is to be given controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also SSR 96-2p, 1996 WL 374188, at *1.

When the ALJ does not give a treating physician's opinion

controlling weight, he must apply the following nonexclusive factors to determine the weight to give the opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the relevant medical evidence supporting the opinion; (4) the consistency of the opinion with the remainder of the medical record; and (5) the treating physician's area of specialization. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, the ALJ is only required to consider these factors in deciding what weight to give a medical source opinion; the ALJ is not required to record in writing every step of the process. See 20 C.F.R. §§ 404.1527(c), 416.927(c) ("Unless we give a treating source's opinion controlling weight . . . we *consider* all of the following factors in deciding the weight we give to any medical opinion.")(emphasis added).

Plaintiff argues that the ALJ failed to give Dr. Williamson's medical opinion controlling weight and failed to discuss the factors listed in 20 C.F.R. §§ 404.1527, 416.927 before deciding not to afford it controlling weight. Plaintiff's argument fails for several reasons.

First, the ALJ evaluated Dr. Williamson's opinion and provided good reasons for affording it little weight. The ALJ found that Dr. Williamson's opinion was not consistent with his treatment notes and other medical evidence, that it was not consistent with

Plaintiff's own self-reporting, and that the limitations were so extreme as to lack "even the most basic veracity."[124] Consistency with the medical record is one of the requirements for affording a provider's opinion controlling weight. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p, 1996 WL 374188, at *1. Accordingly, the ALJ fulfilled his duty to provide good reasons, and the disagreement with the ALJ's conclusion does not support reversal.

Second, the regulations require only that the ALJ *consider* the listed factors before affording a treating physician's opinion less than controlling weight. See 20 C.F.R. §§ 404.1527(c), 416.927(c). In this case, the ALJ specifically stated that he considered all opinion evidence in accordance with these regulatory requirements.[125] The court finds no reason to doubt that he did.

Third, Dr. Williamson's opinion that Plaintiff was totally incapacitated is not consistent with other answers on the form or his own treatment records. The only functional area in which Dr. Williamson identified a deficit was in breaking down complex tasks into simple steps and carrying them out. The form indicated that all areas that applied should be marked. Dr. Williamson, by marking only one, found no deficits in Plaintiff's abilities to remember, to understand and communicate, to reason logically, and

---

[124]    Tr. 53.

[125]    See Tr. 49.

to grasp abstract aspects of her situation, among other areas listed.  Dr. Williamson also found Plaintiff capable of half of the categories of decisions listed.  Additionally, treatment notes throughout her treatment with Dr. Williamson reflected essentially normal mental status examinations and successful medication management of her impairments, especially toward the end of the alleged disability period.

Plaintiff's contention that Dr. Costa's report on the consultative examination should have received greater weight fares no better.  Even though the agency disregarded the report because it contained incorrect and misleading information, the ALJ evaluated it and gave it a limited amount of weight.  Plaintiff points specifically to Dr. Costa's opinions that Plaintiff "may have difficulty with complex **and simple** directions" and that she "may also have difficulty communicating and working with others."[126] Plaintiff complains that those opinions are inconsistent with the ALJ's RFC findings that Plaintiff could perform simple work and could get along with others.  This argument fails for at least two reasons.

First, the ALJ met his obligation to decide what weight to give Dr. Costa's consultative examination report.  Even though she was not a treating source, the ALJ provided good reasons for

---

[126]     Doc. 22, Pl.'s Brief in Support of Summ. J. & Resp. to Def.'s Brief p. 7.

discounting it.  He found that it was inconsistent with the medical record and that Dr. Costa relied on Plaintiff's self-reporting of symptoms.  Indeed, other than the record review for Plaintiff's diagnosis history and the mental status examination, all of information on which Dr. Costa recorded as the basis for her opinion was provided by Plaintiff and her stepmother.  The ALJ therefore complied with the regulations by explaining the weight given Dr. Costa's opinion.

In relation to the prior argument, Plaintiff also contends that, because statements by Plaintiff are considered evidence, the ALJ should not have discounted Dr. Costa's opinion.  That misses the point.  The ALJ considered Plaintiff's subject statements in his decision.  But filtering those statements through self-reporting to a consulting examiner does not elevate their status to that of medical opinions.

Second, the ultimate responsibility for determining a claimant's RFC lays with the ALJ.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Taylor v. Astrue, 706 F.3d 600, 602-03 (5ᵗʰ Cir. 2012); SSR 96-5p, 1996 WL 374183, at **2, 5.  The court may not reweigh the medical evidence or substitute its own opinion as to a plaintiff's abilities.  Brown, 192 F.3d at 496.  As the ALJ committed no error in how he assessed weight to Dr. Costa's opinion or how he supported his RFC finding, the court must defer to his decision.  See id.

Plaintiff contends that the DARS assessment supports Dr. Costa's report by indicating that Plaintiff was disabled and that the ALJ erred in affording it little weight.[127]  This argument also fails for at least two reasons.

First, the DARS assessment did not make a finding of disability nor could it.  The DARS assessment opined that it would be difficult for Plaintiff to attain and maintain a job in a traditional work setting and suggested the possibility of finding a job in which she could work from home.  DARS made recommendations based on its own criteria and guiding principles and was not qualified to offer an opinion on the ultimate issue of disability under SSA regulations and guidelines.  Regardless, disability determinations are reserved to the ALJ.  See 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); SSR 96-5p, 1996 WL 374183, at **2, 5.  A medical source's statement that an individual is disabled (much less another agency's opinion) does not bind the ALJ.  See id.

Second, the ALJ evaluated the DARS opinion and decided to give it little weight.  Here again, the ALJ surpassed his obligation by providing good reasons for his weight determination, finding it inconsistent with the medical evidence and Plaintiff's ADLs.  The

---

[127]  Plaintiff also argues that the DARS assessment's finding that Plaintiff may have had difficulty maintaining employment supports a finding that Plaintiff's impairments waxed and waned.  The medical evidence does not support that finding.  In fact, no evidence suggested that her symptoms waxed and waned to any degree when she remained compliant with medication prescriptions.

ALJ did not err in assigning little weight the DARS assessment.

Finally, Plaintiff briefly challenges the ALJ's decision to give Dr. Campa's record review great weight. She argues in essence, but not in so many words, that Dr. Campa ignored Dr. Costa's consultative examination. Two reasons defeat this argument as well.

First, Dr. Campa clearly considered Dr. Costa's report as he recorded her findings. Second, the ALJ must consider administrative medical findings and may rely on those opinions to the degree the ALJ finds appropriate. See 20 C.F.R. §§ 404.1513a, 404.1527, 416.913a, 416.927; SSR 96-5p, 1996 WL 374183, at *6. The ALJ complied with the regulations by explaining the weight he gave Dr. Campa's opinion.

The court has reviewed the entire administrative record and finds the ALJ's decision to be legally sound and supported by substantial evidence.

### IV. Conclusion

Based on the foregoing, the court **GRANTS** Defendant's Cross-Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Summary Judgment.

**SIGNED** in Houston, Texas, this 19th day of March, 2020.

Nancy K. Johnson
United States Magistrate Judge